## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DARRELL JONES, <br><br>          Plaintiff, <br><br> v. <br><br> CITY OF BROCKTON, Former Brockton Police Officers JOSEPH SMITH, FOTIS COLOCOUSIS, PAUL  WASHEK, RICHARD SHANKS, THOMAS SPILLANE, JOHN LUCIANO, DONALD E. LAGARDE, and ROBERT GILLIS; WILLIAM J. SPROULES, *in his capacity as Personal Representative of the Estate of Former Brockton Police Officer* RICHARD J. SPROULES; and As-Yet Unknown Brockton Police Officers JOHN DOES 1-10 <br><br>          Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No.: _____ <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## **COMPLAINT**

Plaintiff Darrell Jones ("Jones") spent 32 years in prison for a crime he did not commit as a result of the wrongful acts alleged in this Complaint.  He brings this action against the City of Brockton ("Brockton"); former Brockton Police Department ("BPD") officers Joseph Smith ("Smith"), Fotis Colocousis ("Colocousis"), Paul Washek ("Washek"), Richard Shanks ("Shanks"), John Luciano ("Luciano"), Thomas Spillane ("Spillane"); Donald LaGarde ("LaGarde"), and Robert Gillis ("Gillis"); William J. Sproules, as personal representative of former BPD officer Richard J. Sproules ("Sproules"); and yet-unknown BPD officers and supervisors JOHN DOES 1-10 to seek redress against these defendants for their role in depriving him of the rights, privileges and immunities secured by the Constitution and the laws of the United States.

**Introduction**

1.      On the night of November 11, 1985, Jones was at Pete & Mary's Bar in Brockton with friends when a shooting occurred in the D'Angelo's parking lot across the street.  Jones was 18 years old at the time.

2.      Jones was not involved in the shooting in any way.  He did not witness it, and he did not know the victim, a 43-year old man named Guillermo Rodrigues.

3.      Less than a week later, however, Jones was arrested for Rodrigues' murder, and within a year, he was convicted and sentenced to life in prison.  Over the course of the next 32 years, Jones maintained his innocence and fought to clear his name.

4.      As detailed below, the BPD officers involved in the investigation of Rodrigues' shooting knew or should have known that Jones was not the shooter, but they ignored the evidence and, instead, devised and implemented a plan to implicate Jones in the shooting regardless of what the evidence showed.

5.      On December 18, 2017, Superior Court Judge Thomas McGuire granted Jones' third motion for new trial based in part on newly discovered evidence of police misconduct.

6.      The Commonwealth retried Jones in June 2019, and the jury swiftly returned a verdict of not guilty.

7.      Having finally been exonerated, Jones files the instant lawsuit to vindicate his rights and hold accountable those individuals and entities whose actions led to his wrongful conviction and incarceration.

**Jurisdiction and Venue**

8.      This action is brought, *inter alia*, pursuant to by 42 U.S.C. §1983 to seek compensation for Plaintiff for the harms caused by his wrongful conviction.

2

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b), as the events giving rise to the claims asserted herein occurred in this district and multiple Defendants reside in this district.

## Parties

11.     Plaintiff Darrell Jones is, and at all times material to this Complaint was, a citizen and resident of the Commonwealth of Massachusetts.

12.     Defendant City of Brockton, a municipality in the Commonwealth of Massachusetts, was the employer of Defendants Smith, Colocousis, Washek, Shanks, Luciano, Spillane, Gillis, LaGarde, Sproules, and John Does 1-10.

13.     Defendant Joseph Smith was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. At all times stated herein defendant Smith was acting within the scope of his employment.

14.     Defendant Fotis Colocousis was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. At all times stated herein defendant Colocousis was acting within the scope of his employment.

15.     Defendant Paul Washek was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the

Commonwealth of Massachusetts. At all times stated herein defendant Washek was acting within the scope of his employment.

16.     Defendant Richard Shanks was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. At all times stated herein defendant Shanks was acting within the scope of his employment.

17.     Defendant John Luciano was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. At all times stated herein defendant Luciano was acting within the scope of his employment.

18.     Defendant Thomas Spillane was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. At all times stated herein defendant Spillane was acting within the scope of his employment.

19.     Robert Gillis was, at all times relevant to this complaint, Chief of Police of the Brockton Police Department, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts.  On information and belief, Gillis is deceased but his estate was never probated and/or no personal representative was appointed.  Pursuant to G.L. c. 190B, section 3-803(d), Plaintiff is entitled to name Gillis as defendant notwithstanding his death and to serve process on

4

the City of Brockton.  At all times stated herein defendant Gillis was acting within the scope of his employment.

20.     Donald LaGarde was, at all times relevant to this complaint, a duly appointed officer of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. On information and belief, LaGarde is now deceased and no personal representative is appointed.  Pursuant to G.L. c. 190B, section 3-803(d), Plaintiff is entitled to name LaGarde as defendant notwithstanding his death and to serve process on the City of Brockton.  At all times stated herein defendant LaGarde was acting within the scope of his employment.

21.     Richard Sproules was, at all times relevant to this complaint, a duly appointed officer and Chief Detective of the Brockton Police Department, acting under color of law pursuant to the statutes, ordnances, regulations, policies, customs, and usage of the City of Brockton and the Commonwealth of Massachusetts. On information and belief, Sproules is now deceased.  Pursuant to G.L. c. 190B, section 3-803(d), Plaintiff brings this suit against William J. Sproules who, on information and belief, served as personal representative of the estate of Richard Sproules.  To the extent that William J. Sproules did not serve as personal representative or no longer serves in that capacity, Plaintiff is entitled to name Richard Sproules as defendant pursuant to G.L. c. 190B, section 3-803(d) notwithstanding his death.  As used in this Complaint, "Sproules" shall refer to Richard Sproules.  At all times stated herein Sproules was acting within the scope of his employment.

22.     John Does 1-10 were, at all times relevant to this complaint, duly appointed officers of the Brockton Police Department, acting under color of law pursuant to the statutes,

5

ordnances, regulations, policies, customs, and usage of the City of Brockton and the
Commonwealth of Massachusetts. At all times stated herein John Does 1-10 were acting within
the scope of their employment.

## Facts

### The Investigation and Arrest

23.     At approximately 10:30 PM on November 11, 1985, Guillermo Rodrigues was
shot in the parking lot of D'Angelo's Sandwich Shop, across the street from Pete & Mary's Bar
("Pete & Mary's") in Brockton.

24.     At the time of the shooting, Jones was inside Pete & Mary's with his friends,
eating a sandwich. He was wearing a short leather jacket and a distinctive Kangol hat. Jones'
distinctive red "tail," a bushy tuft of dyed hair at the nape of his neck, was visible below the back
of the hat.

25.     Denis Perkins ("Perkins") and Paul Jones (no relation to the plaintiff) witnessed
the shooting from a parked car in the D'Angelo's parking lot. When the shooter ran from the
scene, Paul Jones drove after him. He and Perkins pursued the shooter up Ward Street, where
the shooter veered across a parking lot and over a fence.

26.     Police responded to the scene, and Officers Colocousis and Shanks interviewed
Perkins and Paul Jones, who by then had returned to D'Angelo's after pursuing the shooter.
Perkins and Paul Jones described the shooter as a Black male with short hair wearing a long
black coat. Neither witness mentioned a hat or a dyed "tail" of hair on the back of the shooter's
head.

27.     After speaking to Perkins and Paul Jones, Officers Colocousis and Shanks crossed Montello Street and approached the front door of Pete & Mary's.  As they did so, Jones exited through the front door and approached the officers, asking what had happened.

28.     Shanks knew Darrell Jones and recognized him.

29.     Neither Colocousis nor Shanks viewed Jones as matching the description provided by Perkins and Paul Jones.  They did not question him or present him to Perkins and Paul Jones for an identification.

30.     Officer Colocousis *did* see someone else matching the description, however, and he pursued that individual out of the bar and onto the street, where he detained the man and had Perkins and Paul Jones look at him to see if they recognized him as the shooter.  The man Colocousis showed to Perkins and Paul Jones was wearing a long dark coat.  Perkins and Paul Jones did not identify this man as the shooter.

31.     Before Perkins and Paul Jones drove to the police station for further questioning, Colocousis and Shanks had them examine from their car the small crowd gathered outside to see if they could identify the shooter.

32.     Jones was in the crowd that Perkins and Paul Jones examined, but neither eyewitness identified him as the shooter.

33.     In fact, Jones spoke to Perkins and Paul Jones in the presence of Officer Shanks, asking them whether they were witnesses.

34.     In his report, written later that night, Shanks described the shooter as an "unidentified black male or possible Cuban male."  He wrote that "a search of Pete & Mary's was made with negative results."  Shanks did not mention Darrell Jones in his report.

7

35.     At the station, police showed Perkins and Paul Jones a binder of mug shots and sketches, but neither was able to identify the shooter from among the images they saw.

36.     The day after the shooting, Colocousis and Officer P. Carlson went to see an informant, who allegedly told them that the person responsible for the shooting was a six-foot tall, Black, eighteen year-old named "Diamond."  On information and belief, the informant did not witness the shooting and was not present at Pete & Mary's when the shooting occurred.

37.     Colocousis then learned from Officer James Silva that "Diamond" was a nickname used by Jones.

38.     Officer Colocousis' informant allegedly mentioned Jones' distinctive hairstyle, which Colocousis described as a "close cropped afro with a piece hanging down the middle of the back of his head."

39.     Colocousis obtained a photograph of Jones at some point on November 12 and enclosed a copy with his police report.

40.     On information and belief, Colocousis knew or should have known that Jones was the party he spoke to the night before at Pete & Mary's, that there was nothing unusual in his demeanor, that the clothing he wore did not match the description of the clothing worn by the shooter, that both Perkins and Paul Jones had eliminated Jones as a suspect during the show-up procedure conducted on the sidewalk, and that neither Perkins nor Jones mentioned the shooter having a bushy red "tail" on the back of his head (which they would have noticed since they were chasing the shooter in Paul Jones' car with car lights illuminating the suspect's back).

41.     If the informant actually made the statement attributed to him, Colocousis also knew or should have known that the tip was highly dubious because, if the information were correct, Jones would have had to quickly return to Pete & Mary's after having been chased up

Ward Street by Perkins and Paul Jones, and he would have had to do so *knowing* that the police would be descending on Pete & Mary's imminently in response to the shooting.

42.  Nevertheless, Colocousis ignored these facts and, along with other BPD officers, began to pursue Jones as the prime suspect.

43.  On information and belief, Shanks also knew or should have known that Jones was the party he spoke to the night before at Pete & Mary's, that there was nothing unusual in his demeanor, that the clothing he wore did not match the description of the clothing worn by the shooter, that both Perkins and Paul Jones had eliminated Jones as a suspect during the show-up procedure conducted on the sidewalk, and that neither Perkins nor Jones mentioned the shooter having a bushy red "tail" on the back of his head.

44.  Moreover, Shanks was present when Jones spoke to Perkins and Paul Jones.

45.  However, Shanks ignored these facts and went along with the BPD's misguided pursuit of Jones as the prime suspect.

46.  On November 12, Captain Sproules assigned Detective LaGarde to lead the investigation into the shooting.  After receiving this assignment, LaGarde reviewed the initial police reports of Colocousis and Shanks and then contacted Paul Jones.

47.  LaGarde went to Paul Jones' place of employment on November 12, where he interviewed him and showed him an array containing approximately six to ten photographs of young Black males.  According to a memorandum that LaGarde later wrote to Captain Sproules, the array "included a photo of our prime suspect, a Darrell Jones, known as 'Diamond.'"  Paul Jones was unable to identify the shooter from the array, and he told Detective LaGarde that the victim, Rodrigues, was much taller than the shooter.

9

48.     LaGarde also visited Perkins at her place of employment on November 12.  Just as he did with Paul Jones, LaGarde showed Perkins an array containing six to ten photographs of young Black males.  Perkins eliminated several pictures until she was down to four.  When Perkins was unable to eliminate any more photographs, Detective LaGarde told her words to the effect of, "you're doing pretty good, he's in there."  Perkins was not able to identify the shooter from the array.

49.     Thus, within the first 24 hours of the investigation, Perkins and Paul Jones spoke to Jones, saw him in a show-up procedure, and saw his picture in a photographic array, but neither identified him as the shooter.  Nevertheless, the BPD forged ahead, continuing to treat Jones as the prime suspect.

50.     One or two days later, LaGarde returned for yet another interview with Perkins and Paul Jones and showed them a second array, including the same picture of Jones from the previous one, along with some new faces.

51.     Perkins told LaGarde that she did not get a good look at the shooter and could not be sure.  LaGarde told Perkins that the shooter was in the array and pressed Perkins to pick out the picture that looked *most like* the shooter.  Only then, as part of a third identification procedure, did Perkins select Jones' picture (which she recognized having seen it in the first array), and even as she did, she continued to express doubt.

52.     Similarly, LaGarde pressed Paul Jones to pick out a picture, but he could not identify the shooter from the array.  Paul Jones testified at trial that the picture he selected showed the Black man he saw getting a sub at D'Angelo's shortly before the shooting, *not the shooter*.

10

53.     Later that day, Detective LaGarde attended the autopsy of Rodrigues, who passed away from his injuries on November 14, 1985.  In a memorandum addressed to Captain Sproules, LaGarde reported Rodrigues' height as 6'1", just one inch taller than Jones.

54.     Given that Rodrigues' actual height and Jones' actual height were basically the same, LaGarde knew or should have known that Jones did not fit Paul Jones' description of Rodrigues as being "much taller" than the shooter.  This was all the more true when Perkins testified weeks later that Rodrigues was up to a foot taller than the shooter.

55.     On November 14, Captain Sproules assigned Detective Joseph Smith to assist LaGarde with the investigation.  On information and belief, Detectives LaGarde and Smith functioned as co-lead investigators beginning on that date, reporting directly to Captain Sproules.

56.     On the evening of November 14, Robert Kanicholas, the owner of the Colonial Spa, a bar about one block up the street from Pete & Mary's, contacted the BPD and spoke to Detective LaGarde.  He reported that he found a gun inside a trashcan in the men's room two days earlier.  He also reported seeing a Black male inside the Colonial Spa on the night of the shooting but said he did not think he would be able to identify him.

57.     Detective Walter Mehl transported the weapon to the station and had it dusted for prints.  Jones' prints were not on the gun.

58.     The following day, Detective Smith interviewed Kanicholas.  Smith's written summary of the interview shows that, less than 24 hours after being assigned to the investigation, he had already made up his mind that Jones was responsible for the shooting, that he was pressing witnesses to make shaky identifications, and that he was skeptical of any witness who claimed not to be able to make an identification of Darrell Jones as the shooter.  For example,

after two pages describing efforts to locate Darrell Jones, whom Smith described as the "suspect," Smith wrote the following regarding his interview of Kanicholas:

> *He also admitted that a black male fitting the general description of the assailant was in his barroom that night at approximately the same time or shortly after the shooting, however, conveniently or [in]conveniently, he could not identify this particular person, even though he says it's very, very unusual for a black to be in his establishment.  Again, not much cooperation.*

59.     On information and belief, the only "fit" between Jones' appearance and the description provided by Kanicholas is that Jones is a Black male.  Indeed, at trial Kanicholas testified that he did not notice anything particular about the Black male in his bar, including his clothing.

60.     The discovery of the gun at Colonial Spa only further underscored the preposterous timeline that would have been necessary to support the view that Jones was the shooter.

61.     According to witnesses, the shooting occurred at approximately 10:30 PM, and police records show that Officers Shanks and Colocousis arrived on the scene within minutes after the shooting—just after Perkins and Paul Jones returned to D'Angelo's after chasing the shooter up Ward Street.  The discovery of the gun at Colonial Spa meant that, if Jones were the shooter, he had even less time to return to Pete & Mary's before police arrived because he spent some period of time at Colonial Spa.

62.     Moreover, Jones would have had to return to Pete & Mary's after having been observed in a crowded bar where he was the only Black person, and within minutes of returning to Pete & Mary's he would have had to have a conversation with Officers Shanks and Colocousis that aroused no suspicion—notwithstanding that, if he were the shooter, he had just run several hundred yards up Ward Street while being chased by a car, hopped a fence, entered Colonial

12

Spa, discarded the gun, and hurried back to Pete & Mary's to be present before the police arrived.

63.     That preposterous timeline, combined with the fact that Perkins and Paul Jones did not identify Jones as the shooter despite multiple identification procedures, should have cleared Jones of suspicion, but instead the BPD ignored this information and continued to pursue Jones as its prime suspect.

64.     On November 15, Detective Smith interviewed the girlfriend of an individual named Stevie Betts.  According to Detective Smith's report of the interview, the witness said she had heard that Betts might have been involved in the shooting.  That information echoed what Smith had heard from others because he wrote, "Steven Betts' name has been mentioned several times as possibly being the one that did the shooting."

65.     On information and belief, the police failed to follow up on these leads and, instead, continued to focus their investigation on Jones, even in the face of evidence showing that Jones could not have been the shooter.

66.     Shortly after interviewing Betts' girlfriend, police learned of another group of eyewitnesses, five people who were in a parked car in the D'Angelo's parking lot at the time of the shooting.  Detectives Smith and Washek interviewed three of these witnesses on November 17: Lisa Pina, Edna Levine, and Walter Watson.

67.     In interviewing these witnesses, Smith and Washek made clear that Jones was their suspect and pressured the witnesses to identify him as the shooter.

68.     Smith and Washek showed Lisa Pina a six-person array containing Jones' picture and, even after she said she did not see the shooter's face and broke down in tears, Smith insisted that Pina pick out a picture.  After eliminating three people she knew from the array, Pina

pointed randomly at one of the remaining three pictures, and Detective Smith told her, "you picked out the right one."

69.     Smith and Washek showed Edna Levine the same array, and Levine later testified that Smith asked her to pick out <u>Jones'</u> picture, not the picture of the shooter.

70.     Smith and Washek showed Walter Watson the same array, and he was unable to make any identification.

71.     Detective Washek knew or should have known that Smith's actions were intended to influence the witnesses to identify Jones as the shooter to support the BDP's theory that, contrary to the overwhelming evidence, Jones was somehow responsible for the shooting. On information and belief, Washek willingly participated in Smith's plan and provided material assistance to Smith in executing that plan.

72.     In interviewing Pina, Levine, and Watson, Officers Smith and Washek learned that there were two other witnesses who were in the car with them on the night of the shooting: Terie Starks and Alfred Marrow.  Neither of these witnesses were interviewed prior to Jones' arrest.

73.     On the same day that Smith and Washek were interviewing Pina, Levine, and Watson, Officer Luciano interviewed Miko Brown.  Brown stated that she was with Rodrigues for approximately two hours at Pete & Mary's on the night of the shooting.  According to Brown, Rodrigues left Pete & Mary's with her and asked her if she wanted a ride home.  Brown declined the offer and walked toward Center Street as Rodrigues crossed the street to his car in the D'Angelo's parking lot.

74.     By this point in the investigation, BPD had developed a theory that the shooter walked the victim out of Pete & Mary's at gunpoint, crossed the street to the D'Angelo's parking

lot, and shot him.  Miko Brown's statement was contrary to this theory and suggested that the shooter had not been in Pete & Mary's at all, but rather was someone who intercepted the victim after Miko Brown walked away.  On information and belief, however, Smith, LaGarde, Luciano, Washek, and the other BPD officers assigned to the investigation ignored this evidence and forged ahead with their plan to implicate Jones regardless of what the evidence showed.

75.     Following the interviews of Pina, Levine, and Watson, Detective Smith filled out an Application for Complaint against Jones.  Smith stated in the application that "several persons observed the defendant exit the bar with the deceased" and that the witnesses identified Jones as the shooter from photographic arrays.

76.     Those statements were false.  In fact, *none* of the witnesses made a positive identification of Jones as the shooter, and the witness who was with Rodrigues on the night of the shooting said Rodrigues left with her, not Jones.  Moreover, Smith was aware of at least two eyewitnesses who had not yet been interviewed by police: Terie Starks and Alfred Marrow.

77.     The police arrested Jones on the evening of November 17.  Officers Colocousis and Luciano interviewed him, and he denied any involvement in the shooting.

78.     Jones' booking sheet lists his height as 6'0".

### Post Arrest Conduct by BPD

79.     Within hours of the arrest, Chief Robert Gillis gave an interview to a reporter from the Brockton Enterprise in which he announced that Jones had been arrested and stated that the police had been on high alert since receiving a tip that someone from Rodrigues' family had posted a $20,000 "contract" for Jones' murder.  Gillis said, "We were expecting serious trouble. Every cruiser we sent out tonight had a shotgun.  I understand that anywhere from 25 to 50 Cubans are in Brockton tonight and they are all out to get him."  Gillis added that the BPD had

heard rumors that Jones, in turn, was arming himself.  On information and belief, none of these statements was true.

80.     The Brockton Enterprise article quoting Gillis also included a photograph of Jones, which on information and belief was provided by the Brockton Police Department.

81.     Through his public statements, Chief Gillis expressed confidence to the community that the BPD had captured Rodrigues' shooter, even as its ongoing investigation continued to turn up evidence that Jones had no involvement.  That public display of confidence only increased the pressure on the BPD to convict Jones regardless of the truth.

82.     Moreover, Chief Gillis' statement and the publication of Jones' photograph had the effect of contaminating the pool of eyewitnesses with whom BPD officers had not yet spoken.  On information and belief, Chief Gillis knew or should have known that Smith and LaGarde planned to interview more eyewitnesses after Jones' arrest and that publication of Jones' picture would increase the likelihood that witnesses would recognize Jones' picture in a future photographic array.

83.     At Jones' arraignment on November 18, relying on false information provided by the BPD, the Assistant District Attorney stated that Jones was identified by witnesses though photographic line-ups.  In fact, however, no witness had yet identified Jones as the shooter.

84.     After Jones' arrest, even more exculpatory evidence piled up.  Luciano interviewed two more witnesses from Pete & Mary's, both of whom stated that they were sitting in a booth with Jones on the night of the shooting and that he never left their sight.  Both witnesses told police that Jones was with them when police arrived around 10:30 PM, just minutes after the shooting.  They said Jones was wearing a short brown leather jacket and khaki

colored jeans.  All of these details were inconsistent with a theory that Jones was the shooter, but the BPD ignored them.

85.    Having already informed the public that Jones was the shooter, and having already misrepresented to the Assistant District Attorney that Jones was identified through photograph arrays, this additional evidence was an inconvenient development because it provided yet more evidence that Jones could not have been involved.

86.    The witnesses' statements were consistent with the fact that Jones was in Pete & Mary's when Colocousis and Shanks entered the bar after interviewing Perkins and Paul Jones, and they provided a far more plausible version of events (i.e., that Jones never left Pete & Mary's) than the BPD's theory (i.e., that Jones walked Rodrigues out of the bar and across Montello Street at gun point, shot him in the D'Angelo's parking lot, then fled from the scene only to return just before police arrived, at which point he engaged the officers in conversation without raising any suspicion).

87.    Rather than acknowledge the numerous holes in its theory, however, the BPD ignored this evidence and continued to focus its efforts on obtaining or manufacturing evidence that would support its misguided theory that Jones was the shooter, without regard to the actual truth.

88.    On information and belief, this effort to frame Jones was planned and executed primarily by Detectives Smith and LaGarde, with the knowing, voluntary, and intentional assistance of all of the individual defendants named in this complaint.

### The Terie Starks Interview

89.    Eight days after Jones' arrest, confronted with a pile of exculpatory evidence and no clear identification testimony, the BPD finally got around to speaking with Terie Starks, who

was in the car on the night of the shooting with Pina, Levine, and Watson. The facts and circumstances of that interview—much of which was recorded onto a VHS tape—leave no doubt that its purpose was to implicate Jones in the shooting, and that BPD used the threat of outstanding warrants to coerce Starks into identifying Jones as the shooter.

90.     On November 25, 1985, Officer Luciano drove from Brockton to Methuen to arrest Starks on outstanding warrants. On information and belief, Officer Spillane was also present. On the drive back to Brockton, Luciano and/or Spillane told Starks that they wanted to talk to her about the shooting at Pete & Mary's and that things would go better for her if she provided information. They told Starks they had already arrested the shooter, that his name was Darrell Jones, that he went by the nickname "Diamond," and that he was already in custody.

91.     On information and belief, Officers Luciano and Spillane were acting at the direction of Detectives Smith and LaGarde and knew or should have known that they were being asked to manufacture evidence that would be used to prosecute Jones.

92.     On information and belief, Officers Luciano and Spillane knew that the BPD did not have any positive eyewitness identification of Jones as the shooter and that the purpose of their trip to Methuen was to exert pressure on Starks to coerce her to identify Jones as the alleged shooter.

93.     Officers Luciano and Spillane knew or should have known that it was improper to tell a witness prior to conducting a photograph array the name of the person arrested for the alleged offense.

94.     Through their words and actions, Luciano and, on information and belief, Spillane made clear to Starks that all she had to do to be released was to implicate Jones in the shooting. However, Starks did not implicate Jones in her discussion with Luciano and Spillane.

18

95.    After spending the night in jail, Starks gave a videotaped interview to Detectives Smith and LaGarde the following day, November 26, 1985 (the "Starks Videotape").  The recorded interview lasts approximately 25 minutes and shows, among other things, Detective Smith presenting a photographic array to Starks, who, according to Smith, picks out Jones' picture.

96.    The identification procedure captured in the video is a farce.  Not only did the police tell Starks the night before the interview that they had already arrested Jones for the shooting, but before Detective Smith ever turned on the VHS recorder, he and Detective LaGarde presented the array to Starks to be sure that she would pick out Jones' picture.  In addition, the array included a number of "fillers" depicting people that the police knew lived in Starks' neighborhood, and it omitted any photograph of Stevie Betts, who had been identified as an alternative suspect.

97.    On information and belief, Detectives Smith and LaGarde communicated to Starks before turning on the VCR that they wanted her to pick out Darrell Jones' picture during the recorded interview.

98.    Indeed, in the opening frames of the video, the stack of photographs used in the array is sitting face up, right in front of Starks, with a second set of photographs sitting in front of Detective LaGarde.

99.    Notwithstanding the purported "identification" of Jones as the shooter, the Starks Videotape contains still more exculpatory evidence.

100.    For example, just as Paul Jones and Denise Perkins did, Starks described a significant height difference between the shooter and the victim.  She consistently referred to the

shooter as the "short guy" and the victim as the "tall guy," even though Jones and the victim were essentially the same height.

101.    Moreover, Starks confirmed that Miko Brown was sitting with the victim in Pete & Mary's.

102.    Near the end of the interview, Detective LaGarde remarks about Jones, "You know that at this time he's under arrest." Starks responds, "Yeah. (Indicating) He told me last night he's under arrest."

103.    On information and belief, Starks' outstanding warrants were cleared after she provided police with the evidence they needed to press ahead with their misguided case against Jones.

104.    At some point after the Starks interview, Smith, LaGarde, or another BPD officer acting at their direction took the original VHS tape containing the Starks interview and copied it onto another VHS tape that already contained a recording of a television show called The Phil Silvers Show ("Sergeant Bilko"). In doing so, they removed certain content from the Starks interview and made it look like the excised portion was the result of accidentally recording over the interview.

105.    As a result of this alteration, the "new" version of the Starks Videotape contained what appears to be a 13.5 second interruption during which the Starks interview is replaced by a clip from Sergeant Bilko, as seen in the image below:



106.    The interruption comes at the very moment when Starks begins to describe the shooting.  Detective Smith asks, "Who had the gun," and then the interruption occurs.

107.    On information and belief, Smith, LaGarde, or another BPD officer acting under their direction destroyed or suppressed the original VHS tape after making the secret edit.

108.    On information and belief, the portion of Starks interview excised from the VHS tape showed Officers Smith and LaGarde coaching Starks to identify the photo of Darrell Jones and/or other exculpatory information.

109.    Indeed, in a written memorandum addressed to Captain Sproules, Detective LaGarde included details that do not appear in the Starks Videotape.  LaGarde wrote that although the "complete interview" was taped, he would "add a few of the more important points of the interview."  Included among these important points was that Starks reported having seen

Rodrigues and a second individual "come from behind Pete & Mary's and around from behind the body shop of Montello Street."

110.    The Google Maps satellite image below shows an overhead view of the scene, including D'Angelo's, Pete & Mary's, and the auto body shop on the corner of Montello Street and Ward Street (now Petronelli Way).



111.    Included in the image is a yellow arrow marking the route that Starks said the victim and shooter took "around from behind the body shop on Montello Street." As seen on the image, Starks' statement was contrary to Smith's assertion in the Application for Complaint that several witnesses in the D'Angelo's parking lot saw Jones and Rodrigues exit Pete & Mary's together.

112.    Detective LaGarde's memorandum to Captain Sproules establishes that at least this detail was removed from the Starks Videotape, but on information and belief, Smith,

LaGarde, or another BPD officer acting under their direction edited the tape to remove additional exculpatory material.

113.    In total, Smith, LaGarde, or another BPD officer acting under their direction removed between eighteen seconds and two minutes and sixteen seconds of the original recording.

### Pre-trial Testimony Regarding Height Difference

114.    Although BPD knew prior to Jones' arrest that the shooter was significantly shorter than Rodrigues, even more information about the height difference came to light after arrest.

115.    Denise Perkins testified in November or December 1985 that Rodrigues was up to a foot taller than the shooter.

116.    Paul Jones (who told Colocousis the day after the shooting that Rodrigues was "much taller" than the shooter) testified in November or December 1985 that he saw the shooter and Rodrigues walking side-by-side and that the height difference was about six inches.

117.    Terie Starks described the shooter during her videotaped interview with Smith and LaGarde as the "short guy," "the short man," and the "small guy."  Days or weeks later, she testified under oath that the victim was "real tall" and that the shooter was a "short fellow."

118.    All of this testimony ran counter to the BPD's assertion that Jones was the shooter, but it was ignored.

### The Trial

119.    At the 1986 trial, not a single witness made an in-court identification of Jones as the shooter.

120.    Asked to look around the courtroom and identify the shooter, Perkins testified, "I can't be one hundred percent sure so I'd have to say no."

121.    Perkins also denied making an out-of-court identification of Jones the day after the shooting.  She testified that she narrowed the array down to four pictures but could go no further, at which point LaGarde told her, in substance, "you're doing good; he's in there."

122.    Starks testified, "I can't be positive."

123.    Pina testified that Detective Smith forced her to pick out a picture, and testified that the picture she picked out was not the shooter.

124.    Levine testified that Detective Smith showed her the array and asked her to point out Darrell Jones; she emphasized at trial that she did not see and could not identify the shooter.

125.    Walter Watson testified that the police showed him an array, but he was unable to identify anyone.

126.    Without eyewitness testimony, physical evidence, or a motive, the Commonwealth's case came to rely heavily—if not entirely—on the testimony of the BPD officers involved in the reckless and biased "investigation" that led to Jones' wrongful arrest and prosecution.

127.    Rather than testify truthfully about that investigation, however, Officers Smith, LaGarde, Colocousis, and Shanks provided false testimony to conceal evidence of the BPD's wrongdoing and to carry out its goal of implicating Jones in the shooting.

128.    For example, although Officer Shanks admitted that Jones was present at Pete & Mary's when the BPD was conducting its investigation at the scene, he testified that Jones did not speak to Perkins and Paul Jones, and that Jones was about forty yards away when Perkins

and Paul Jones examined the crowd and told police the shooter was not present. This testimony was false.

129.    On information and belief, Shanks provided this false testimony to provide a plausible reason why—if Jones was the shooter and Perkins and Paul Jones witnessed the shooting—the BPD did not question or take him into custody on the night of the shooting.

130.    In a similar vein, Officer Colocousis testified that the initial description of the shooter he received from Perkins and Paul Jones was a Black male "in the area of six feet tall." This testimony was false. In fact, Perkins testified at the grand jury that Rodrigues was up to a foot taller than the shooter, and Paul Jones told LaGarde the day after the shooting that Rodrigues was much taller than the assailant.

131.    On information and belief, Colocousis provided this false testimony to minimize the significant evidence of a substantial height difference and to create the false impression that Perkins and Paul Jones' subsequent estimates of the shooter's height were unreliable.

132.    Detective LaGarde testified that he showed Perkins a photographic array the day after the shooting and that she identified Jones as the shooter within a couple of minutes. This testimony was also false. In fact, Perkins narrowed the array down to four pictures but was unable to make an identification, even after LaGarde encouraged her by telling her that the shooter was included in the remaining photographs.

133.    Detective LaGarde testified that he showed Perkins *the same array* two days later—even though she supposedly picked out Jones' photograph within a couple of minutes the first time—because she had initially expressed some doubt. This testimony was also false. In fact, the second array LaGarde showed Perkins was different from the first; it contained the same picture of Jones, but new fillers.

134.    Detective LaGarde also testified that Perkins told him that she had been reluctant to pick Jones' picture the first time because she was in fear of retaliation.  This testimony was also false.

135.    On information and belief, LaGarde provided this false testimony to impeach Perkins' credibility, to falsely portray his multiple identification procedures as being done to ensure the validity of Perkins' alleged identification, to conceal the suggestive nature of the array procedures, and to provide a plausible – thought utterly false – rationale for Perkins' expressions of doubt as to her alleged identification of Jones.

136.    Detective Smith also provided false testimony to conceal evidence of the BPD's wrongdoing and to carry out its goal of implicating and obtaining a conviction of Jones.

137.    First, to impeach the testimony of Levine, who testified that Smith showed her an array and asked her to pick out *Darrell Jones*' picture, Smith testified that he asked Levine to pick out the picture of the shooter.  This testimony was false.

138.    Second, to impeach the testimony of Pina, who testified that Smith forced her to pick out a picture and that the picture she picked out was not the shooter, Smith testified that Pina answered yes when he asked, "Is this the man that did the shooting?"  This testimony was also false.

139.    Third, to facilitate admission of the Starks Videotape into evidence, Detective Smith testified falsely as to the origin of the Sergeant Bilko interruption.

140.    Specifically, during a voir dire examination, Detective Smith testified that he "inadvertently, somewhere along about the middle of the interview, pressed the record button on the V.C.R. as opposed to the play button and recorded about 20 second of a T.V. program."  The

26

trial judge allowed the Starks Videotape to be played to the jury based on Detective Smith's testimony of an alleged innocent mistake.

141.    Detective Smith repeated the same basic testimony to the jury: "I inadvertently pressed [the] record button rather than the play button at one point along about the middle of the interview … and there is about 15 seconds, 20 seconds, of a network show that was recorded over a portion of the Terie Starks interview, it's when Sergeant Bilko comes charging in."

142.    This testimony was false.

143.    In fact, recent forensic examination of the Starks Videotape shows that it was affirmatively edited to omit between eighteen seconds and two minutes and sixteen seconds of the Starks interview.  The forensic markers showed that Sergeant Bilko was recorded onto the tape first, and that, using two VCRs, someone recorded portions of the original Starks interview onto the VHS tape containing the Sergeant Bilko program.

144.    This procedure (sometimes called a "crash edit") made it falsely appear that: (a) the VHS tape presented to the jury contained the original recording of the Starks interview and (b) the omitted segment was accidentally recorded over.

145.    Detective Smith knew when he testified that the Sergeant Bilko interruption was the result of BPD's evidence tampering.  Rather than reveal the true facts concerning BPD's efforts to pin the blame for Rodrigues' death on Jones using fabricated evidence, Detective Smith testified falsely in 1986 that the interruption was just an innocent mistake.

146.    Unaware of the true facts concerning the Starks Videotape or the falsity of the testimony of the BPD officers and detectives, and faced with inconsistent evidence between the eyewitnesses and police officers, the jury convicted Jones of Rodrigues' murder.

### *Post-Conviction Proceedings*

27

147.     Decades after Jones' conviction, Judge Thomas McGuire, a superior court judge in Plymouth County, allowed a motion for evidentiary hearing regarding newly discovered evidence that the BPD conducted a crash edit to remove content from the videotaped interview of Terie Starks and make it look like an accident.

148.     On July 13, 2017, Detective Smith testified at the evidentiary hearing. Repudiating his trial testimony that he had caused the interruption by accidentally pressing *RECORD* instead of *PLAY*, Detective Smith claimed that nobody, including him, "ever went near the machine" and that he had "no idea" how the Sergeant Bilko clip ended up on the Starks Videotape: "How it got there," he said, "your guess is as good as mine."

149.     Moreover, Detective Smith denied performing a crash edit. Indeed, he denied having the technical capability to do such a thing. "They give me credit for more than I know," he said. "I couldn't do that. If you offered me a million dollars, I couldn't do it."

150.     This testimony was false. In fact, Detective Smith *did* know how to edit the tape in the manner alleged, as reflected by the transcript of Jones' first trial. In an on-the-record discussion of how to avoid showing the jury portions of the tape deemed inadmissible, the prosecutor offered the following solution:

> Your Honor, Detective Smith proposed something, that if we were to have two machines and sit down and have this tape [played] and record tape, the other machine record, we could do it so [a]s that we would take the parts that would be admissible from this tape and put them on the other tape.

151.     What Detective Smith proposed in 1986 is the very definition of a "crash edit."

152.     Based on this exchange, Judge McGuire found that Detective Smith testified falsely at the 2017 evidentiary hearing when he denied having the technical capability to perform the type of crash edit that caused the deletion of key evidence in Jones' case.

153.     Judge McGuire also found that Detective Smith testified falsely at Jones' 1986 trial.  In the face of Smith's 2017 testimony that he never touched the VCR, Judge McGuire found that Smith's 1986 testimony that *he* caused the Bilko interruption when he inadvertently pressed the RECORD button was not true.

154.     On information and belief, Detective Smith provided this false testimony in furtherance of the BPD's goal to ensure Jones' conviction and to avoid revealing the true facts concerning the BPD's intentional alteration and destruction of exculpatory evidence.   As Judge McGuire alluded to in his written findings, Detective Smith's false testimony regarding the Starks Videotaped called into question his other testimony as well:

> Det. Smith was the lead investigator and a key witness at trial.  He testified that both Edna Levine and Lisa Pina picked out the defendant's photograph as the shooter, while they both denied having made the identifications…. If the jury had known of Det. Smith's false testimony and that the police edited the recording to remove important evidence, it is reasonably likely that such knowledge could have affected their judgment. Because Det. Smith's false testimony could have affected the jury's judgment, a new trial is required.

155.     Indeed, as alleged herein, Smith's false testimony was not limited to the Starks Videotape.  To the contrary, Smith, LaGarde, Shanks, and Colocousis testified falsely concerning alleged out-of-court statements and identifications in furtherance of the BPD's goal to ensure Jones' conviction and to avoid revealing the true facts concerning the BPD's effort to manufacture evidence that would help accomplish that goal.

### Recklessness, Corruption, and Lack of Training and Oversight at BPD

156.     The conduct of the individual defendants was no accident.  To the contrary, leadership within the BPD in the mid-1980s encouraged and facilitated the type of reckless, biased, corrupt, and unprofessional investigation that led to Jones' wrongful conviction.

157.    One significant and contemporaneous other example of the recklessness, corruption, and lack of professionalism that plagued the BPD during the relevant time period is the case of Nicholas Celia, who was indicted in January 1985 on charges of stealing drugs from the BPD evidence room.

158.    The facts of the Celia case bear some key similarities to the facts of Jones' case. Both involved a rushed investigation with a lack of appropriate oversight, fabrication of evidence, and a fixation on implicating the suspect rather than discovering the truth.

159.    Celia's trial took place in October 1985, just a month before the shooting at D'Angelo's, and addressed underlying conduct that took place in 1984.

160.    Crucial to Celia's defense was an evidence log book used by the BPD to track drugs taken out of the evidence locker.   The prosecution sought to prove that entries in the log indicated Celia took the missing cocaine.  However, Celia showed that there were dozens of incomplete entries from numerous BPD officers indicating unreturned drugs.

161.    In fact, just two weeks before the trial, Sproules sent a memorandum to Gillis identifying 25 officers who had signed out drug evidence for court and never signed it back in, including Smith and Spillane.

162.    Celia was cleared of all charges by a jury and reinstated over Chief Gillis' objections.

163.    Following his reinstatement, Celia sued the City of Brockton and several police officers, including Gills, alleging civil rights violations.  In *Nicholas Celia, Jr., vs. City of Brockton, et al.*, 1990 U.S. Dist. LEXIS 2572 (D. Mass 1990), Celia alleged among other things that the BPD investigators attempted to alter or destroy evidence favorable to him.  Celia

submitted an affidavit of Joseph Butler, a 15-year veteran police officer in the BPD, in support of his allegation.

164.     Butler's affidavit stated that shortly after Celia was indicted, he saw then-Captain Sproules "making entries in the Drug Evidence Log for dates that had already passed." Butler further stated that he heard Sproules tell officers who were inquiring about what they should do regarding drugs they had checked out but could not find, "I don't care what it is, just bring something back." Butler stated that Lieutenant Robert DiCarli, who was charged with investigating the missing drug evidence, did not contradict Sproules' comment and that he and Sproules made false entries in the Log to conceal the fact that numerous pieces of drug evidence were never signed back in. *See Celia*, 1990 U.S. Dist. LEXIS 2572 at *3.

165.     During the pendency of Celia's civil rights litigation, in October 1989, Sproules (who by then had been promoted to Chief of Police) was arrested and charged with stealing drugs from the BPD evidence room.

166.     The following month, Sproules was arraigned on additional charges, including:

   a.   Attempting to procure perjury (asking Det. Arthur McClaren to call in sick and later to say his car was broken rather than testify before a grand jury in a drug case in which Sproules had adulterated the evidence),

   b.   Obstruction of justice in another Brockton drug case dating back five years,

   c.   Larceny of more than $250 (stealing $4,700 in seized drug money), and

   d.   Witness intimidation (intimidating two officers into helping him cover up thefts of cocaine and money).

167.    Sproules admitted as part of a plea deal in June 1990 that he stole cocaine and cash from the evidence room for several years beginning in 1984, which would have included the time of the Rodrigues investigation.

168.    In an interview with a Boston Globe reporter in July 1990, Sproules described his substance abuse in stark detail.  Among other things, Sproules stated that he had been addicted to cocaine for five years, beginning in 1984, and that his subordinates likely suspected his crimes but hesitated to turn him in because of his rank and their loyalty.  At first, Sproules said, he used cocaine from a one-kilogram bag used as a prop at anti-drug lectures.  Once that was gone, he began stealing cocaine from the evidence room—first from resolved cases and, later, from pending prosecutions.

169.    Meanwhile, the court in *Celia v. Brockton* denied the City's motion for summary judgment, finding that:

> Gillis was Chief of Police at the time the drug investigation, which ultimately led to Celia's prosecution, occurred. It was upon his direct order that DiCarli headed the investigation. During that investigation, the drug evidence log was allegedly altered. According to Butler's affidavit, DiCarli was present during the alleged altering. DiCarli reported directly to Gillis throughout the investigation. That is enough to indicate that Gillis knew or should have known of the unconstitutional conduct regarding the drug evidence log. Like the Court stated in *Bordanaro*, "Chief [Gillis's] failure to eradicate this facially unconstitutional practice from the police department attributes that custom to the municipality.

*See Celia,* 1990 U.S. Dist. LEXIS 2572 at *6-7.

170.    Both Celia and Jones were targets of hasty and poorly executed BPD investigations that lacked any meaningful oversight or supervision.  Both Celia and Jones were the victims of the BPD's practice of manufacturing and tampering with evidence to implicate suspects rather than following the evidence wherever it may lead.

### *Municipal Liability: Pattern and Practice of Evidence Tampering*

171.    Robert Gillis was the Chief of Police of the Brockton Police Department and as a delagee of defendant City of Brockton had general supervisory duties to administer and comply with existing Federal and State laws and regulations and to establish policies, procedures, and practices for the Brockton Police Department. Pertinent to this complaint, Gillis had the responsibility for: establishing policies and practices to be followed by detectives and officers during criminal investigations, including identification procedures and the handling of exculpatory evidence; formulating and implementing policies that discipline detectives and officers when appropriate; and the general maintenance of professionalism in the police department.

172.    Richard Sproules was the Chief Detective of the Brockton Police Department. As Chief Detective, Sproules as a delagee of the defendant City of Brockton had general supervisory duties to administer and comply with existing Federal and State laws and regulations and to establish policies, procedures, and practices for the Brockton Police Department and especially for the Detective Unit, inter alia, defendant Sproules had responsibility for making policy decisions regarding how investigations were conducted and what techniques were used by detectives; and for policy decisions that investigated, sanctioned, or disciplined detectives for misconduct.

173.    Robert Gillis, as Chief of Police of the Brockton Police Department and together with his delegate Chief Detective Richard Sproules, are the final policy makers for the defendant City of Brockton in regard to establishing and formulating policies, practices, and customs regarding techniques used in criminal investigations by Brockton Police Department detectives and officers.

33

174.     Prior to Jones' September 1986 trial, the defendant City of Brockton, through its final policy makers, Chief of Police Robert Gillis and his delegate Chief Detective Richard Sproules, maintained a practice and custom of evidence tampering in criminal investigations.

175.     The purpose of this practice was to alter evidence in a way that would implicate the BPD's chosen target—regardless of actual guilt or innocence—in order to complete criminal investigations quickly and obtain convictions.

176.     The federal district court for the District of Massachusetts held in *Celia v. City of Brockton* that 1) Chief of Police Robert Gillis was a final policymaker for the City; 2) Chief Gillis directly ordered Officer Robert DiCarli to head the investigation into the missing evidence locker cocaine; 3) Officer DiCarli reported directly to Chief Gillis throughout the investigation; and 4) Officer DiCarli, along with Chief Detective Richard Sproules, was present during the alleged alteration of evidence, indicating that Chief Gillis "knew or should have known of the unconstitutional conduct." The court concluded that Chief Gillis' "failure to eradicate this facially unconstitutional practice from the police department attributes that custom to the municipality."

177.     On information and belief, neither the City of Brockton nor the BPD disciplined any BPD supervisors or officers responsible for the evidence tampering in Officer Celia's case. In effect, both the City of Brockton and the BPD condoned this behavior.

178.     Chief Detective Sproules was Police Chief Gillis' handpicked successor, and succeeded him as Chief of Police in 1987. Officer DiCarli became acting Chief of Police in 1989 when Sproules resigned amidst charges of stealing cocaine from the BPD evidence room.

34

179.    The failure to discipline by Police Chief Gillis and the advancement of the careers of Chief Detective Sproules and Officer DiCarli sent a clear message to the BPD detectives and officers that evidence tampering was a condoned practice.

180.    This explicit condonation, as well as the general culture of recklessness and corruption within the BPD, made it clear that case clearance was prized above all, and anything, including evidence tampering, was fair game when it came to criminal investigations.

181.    Jones spent 32 years in prison as a direct result of the Brockton Police Department's practice of tampering with evidence.

182.    Specifically, one or more officers of the BPD tampered with the Starks Videotape by performing a crash edit and thereby secretly removing testimony by Terie Starks that, on information and belief, was exculpatory.

183.    In an effort to keep the BPD's practice of evidence tampering concealed at Jones' 1986 trial, Detective Smith provided false testimony under oath, stating that the Sergeant Bilko interruption was the result of accidentally pressing *RECORD* instead of *PLAY* on the VCR.

184.    Thirty years later, Detective Smith continued to provide a false account to conceal the BPD's practice of evidence tampering.  As Judge McGuire found, Detective Smith falsely disclaimed knowledge of how to perform a "crash edit" and insisted that he had no idea how the Bilko interruption occurred.

185.    Only through the use of modern forensic technology—which proved that the Starks Videotape had been tampered with and that Detective Smith had testified falsely—was Jones successful in his motion for new trial and then acquitted of the murder charge.

186.     As a result of the Brockton Police Department's policy and practice of evidence tampering in criminal investigations, Jones was deprived of his liberty without receiving a fair trial.

### *Municipal Liability: Failure to Train, Supervise, and Discipline*

187.     Prior to Jones' September 1986 trial, the defendant City of Brockton, through its final policy makers, Chief of Police Robert Gillis and his delegate Chief Detective Richard Sproules, failed to train, supervise, and discipline Brockton Police officers and detectives in proper investigative techniques.

188.     Brockton Police detectives and officers conducted identification procedures that were suggestive and coercive and that have since been shown to produce unreliable results; they altered and tampered with key evidence; they failed to pursue alternative leads; they ignored or concealed exculpatory evidence; and they provided false testimony to conceal their violations of Jones' constitutional rights.

189.     Chief of Police Gillis and Chief Detective Sproules valued speed and case clearance over procedure, thoroughness, and the Constitutional rights of criminal suspects and defendants.

190.     Chief of Police Gillis and Chief Detective Sproules' misconduct in the investigation into the missing cocaine and resulting criminal case involving Officer Nicholas Celia demonstrated that evidence tampering, scapegoating, and the ignoring of alternative suspects were condoned and encouraged by the Brockton Police leadership.

191.     Chief Detective Richard Sproules failed to provide appropriate supervision of BPD detectives due to his substance abuse and addiction, as well as his own misconduct in prior investigations which set poor examples for his subordinate detectives.

36

192.     On information and belief, Chief of Police Gillis was aware of Chief Detective Sproules' inability to supervise Brockton Police detectives but did nothing to remedy this lack of leadership.

193.     On information and belief, the Brockton Police detectives and police officers were not provided training in proper investigative techniques, such as training in conducting a non-coercive witness interview or non-suggestive photographic array.  They would not be trained properly until years after Jones's arrest.

194.     The general culture of recklessness, corruption, and unprofessionalism at the BPD demonstrates that the BPD detectives and officers were not supervised, trained, or disciplined in proper investigative techniques.

195.     The need to supervise, train, and discipline the BPD detectives and officers in proper investigative techniques was apparent, especially after the botched investigation of Officer Celia the year before, as well as the myriad police misconduct complaints and civil rights case filed against Brockton Police officers in the years before Jones' arrest.

196.     As a direct result of BPD's failure to supervise, train, and discipline its officers, Smith, LaGarde, Washek, Colocousis, Shanks, Spillane, and Luciano conducted a sloppy and reckless investigation into the murder of Guillermo Rodrigues and sought to implicate Jones without any motive, physical evidence, or eyewitness identification, and in the face of exculpatory evidence showing Jones was not the shooter.

197.     As a direct result of BPD's failure to supervise, train, and discipline its officers, the Detectives Smith and LaGarde failed to pursue other leads.

198.     As a direct result of BPD's failure to supervise, train, and discipline its officers, Smith, LaGarde, Washek, Colocousis, Shanks, Spillane, and Luciano employed improper

investigative techniques in order to conform the evidence to their tunnel-vision focus on Jones. In particular, despite significant evidence showing that Jones could not have been the shooter, these officers pushed witnesses to implicate him in interviews, and Detectives Smith, LaGarde, Washek, Luciano and Spillane presented or facilitated the presentation of suggestive photographic arrays in which they indicated through words or actions that they wanted the witnesses to pick out Jones' picture.

199.    As a direct result of BPD's failure to supervise, train, and discipline its officers, Detectives Smith, LaGarde, Spillane, and Luciano participated in a highly coercive interview of Terie Starks, and then one or more officers at BPD tampered with the videotape to prevent exculpatory evidence for Jones from surfacing prior to trial.

200.    As a direct result of BPD's failure to supervise, train, and discipline its officers, Smith, LaGarde, Shanks, and Colocousis provided false testimony at Jones' 1986 trial, in an effort to keep their wrongdoing from coming to light.

201.    Detectives Smith and LaGarde were not supervised, trained, or disciplined in proper investigative techniques, and neither were the numerous other BPD officers who assisted in the investigation.

202.    The failure by the Defendant City to properly supervise, train, and discipline its police officers in proper investigative techniques could predictably result in constitutional harm to citizens.

203.    This failure did, in fact, result in harm to Jones, as the officers' botched investigation, suggestive photographic arrays, coercion of witnesses, tampering with evidence, destruction of exculpatory evidence, and false testimony directly resulted in Jones' wrongful conviction and incarceration.

204.     The Defendant City's failure to supervise, train, and discipline its detectives and officers in proper investigative techniques constituted deliberate indifference to the constitutional rights of citizens.

### *Damages*

205.     The actions of the Defendants set forth herein unlawfully deprived Jones of his civil rights under the Constitution and the laws of the United States and the Commonwealth of Massachusetts.

206.     In serving 32 years in prison, Jones was wrongfully deprived of virtually his entire adult life up until the time of his release.  Jones must now attempt to make a life for himself outside of prison without the benefit of the decades of life experiences which ordinarily equip adults for that task.

207.     The effect of more than three decades of wrongful incarceration on Jones' life has been profound, including physical and psychological harm, as well as lost economic opportunities.

208.     This harm includes but is not limited to: having to survive from the age of eighteen in a prison environment, being targeted by inmates and correctional officers, being deprived of educational and vocational opportunities, being unable to attend the funerals of family members, including Jones' beloved grandmother and a son who died tragically in a shooting; being unable to form and maintain relationships; and being forced to live out the most formative years of adulthood in a state of grief and alienation, much of it in solitary confinement.

**<u>Count I</u>**
**42 U.S.C. §1983 Claim for Malicious Prosecution in Violation of the Fourth Amendment**
**(Against Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, Gillis and One or More John Doe Defendants)**

209.     Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

210.     Defendants, under color of state law and with malice and knowledge that probable cause did not exist to arrest Plaintiff and prosecute him for the murder of Rodrigues, acting individually and in concert, caused Jones to be arrested, charged, and prosecuted for that crime, thereby violating Jones' clearly established right under the Fourth Amendment to be free from unreasonable searches and seizures.

211.     Specifically, Defendants knew or should have known that probable cause did not exist to arrest and prosecute Jones for the reasons set forth above, including:

   a.   Eyewitnesses described a significant height difference between the shooter and Rodrigues, as much as one foot according to Denise Perkins, and Jones was virtually the same height as Rodrigues;

   b.   Officers Colocousis and Shanks spoke to Jones at Pete & Mary's after the shooting and did not view him as a suspect based on the description of the shooter provided by Perkins and Paul Jones;

   c.   Perkins and Paul Jones did not identify Jones as part of the show-up procedure conducted on the sidewalk outside of Pete & Mary's;

   d.   During the course of their investigation Defendants procured false witness identifications of Jones by, among other means, improperly influencing witnesses to identify Jones as the shooter, improperly influencing witnesses not to identify others as the shooter, publicly revealing Jones' name and photograph to contaminate the testimony of witnesses and potential witnesses, and falsely

describing witnesses as having identified Jones as the shooter when they had not in fact done so.

e. At trial, Officers Smith, LaGarde, Shanks, and Colocousis presented false testimony regarding alleged out-of-court identifications and statements provided by eyewitnesses.

212. These factors, as well as additional material exculpatory and impeachment evidence which Defendants Smith and LaGarde did not disclose to the Commonwealth and grand jury, undermined the evidence presented in support of a probable cause finding against Jones.

213. Defendants performed the above-described acts with malice, under color of state law, deliberately, intentionally, or with reckless disregard of the truth and Jones' rights.

214. Defendants initiated and continued the prosecution against Jones without probable cause, in violation of Jones constitutional rights.

215. No reasonable detective or officer would have believed that this conduct was lawful.

216. Jones did not commit the murder of Guillermo Rodrigues.

217. Despite his innocence and the absence of probable cause to prosecute him, Jones was held from his arrest by BPD on November 17, 1985 until shortly after the court vacated his conviction on December 18, 2017.

218. As a direct and proximate result of Defendants malicious acts, Jones was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 32 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

41

**Count II**
**42 U.S.C. §1983 Claim for Unduly Coercive, Suggestive, Biased, and Otherwise Improper Identification Procedures in Violation of the Fourteenth Amendment**
**(Against Smith, LaGarde, Luciano, Spillane, and Washek)**

219.    Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

220.    Defendants Smith, LaGarde, Luciano, Spillane, and Washek, under color of state law, facilitated identifications using unduly coercive and suggestive identification procedures, which led to the improper identification of Jones as the individual who allegedly shot Rodrigues. These improper procedures are set forth above and included, among other things:

a.  Arresting Starks, tying her identification of Jones as the shooter to her release, telling her that Jones was the shooter and that he was in custody, presenting Ms. Starks with the photographic array before videotaping to ensure she would identify Jones, and then performing the "crash edit" that allowed Defendant Smith to materially alter the videotape showing Ms. Starks's purported identification.

b.  Conducting multiple identification procedures with Perkins and Paul Jones after they failed to identify Jones as the shooter during the show-up procedure outside of Pete & Mary's on the night of the shooting.

c.  Including Jones' picture in both the first and second arrays shown to Perkins and Paul Jones, while replacing many of the other photographs in the first array with photographs of different individuals in the second array.

d.  Instructing witnesses that the shooter's picture was included in the array.

e.  Directing witnesses, including Levine, to identify Jones' picture in the array, not the picture of the alleged shooter.

42

    f.    Arranging the photographs in a manner to draw attention to Jones' picture, as Detective Smith can be seen doing in the Starks Videotape.

    g.    Including as "fillers" individuals who police knew lived in the same neighborhood or were otherwise known to the witnesses.

    h.    Encouraging witnesses to make an identification in the face of doubt by telling the witnesses that the shooter was included in collection of photographs not yet eliminated from contention.

    i.    Including Jones' picture in photographic arrays where witnesses described the shooter as significantly shorter than Rodrigues and where Jones was virtually the same height as Rodrigues.

    j.    Excluding alternative suspect Stevie Betts' photograph from arrays shown to witnesses.

221.    Defendants committed these unduly coercive, suggestive, biased, and otherwise improper acts intentionally and with deliberate indifference to Jones' clearly established constitutional rights.  No reasonable detective or officer would have believed these procedures were lawful or would produce reliable identification.

222.    As a direct and proximate result of these unduly coercive procedures by the BPD, witnesses falsely identified Jones in the photo arrays and line-ups in violation of Jones' Fourteenth Amendment right to a fair trial and not to be deprived of liberty without due process of law.

223.    Due to Defendants' misconduct, Jones suffered 32 years of wrongful imprisonment; and endured all of the other physical, emotional and pecuniary damages set forth above.

**Count III**
**42 U.S.C. §1983 Claim for Evidence Tampering in Violation of the Fourteenth Amendment**
**(Against Smith, LaGarde, and One or More John Doe Defendants)**

224.     Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

225.     As found by Superior Court Justice McGuire, one or more members of the BPD performed a "crash edit" of the Starks Videotape, thereby removing certain content from the recorded interview.

226.     As co-lead detectives, Smith and LaGarde had access to the original Starks Videotape and the means to perform the crash edit.

227.     On information and belief, Smith, LaGarde, and/or someone at BPD working under their direction performed the crash edit and then destroyed or otherwise suppressed the original videotape.

228.     On information and belief, the excised portion of the Starks Videotape included exculpatory evidence or evidence revealing Smith and/or LaGarde's efforts to coach and pressure Starks into implicating Jones.

229.     The Starks Tape was the pivotal piece of evidence in Jones trial and appeals, and its admission into evidence was accomplished through false testimony provided by Smith.

230.     Defendants performed the above-described acts under color of state law, deliberately, recklessly, and with deliberate indifference or reckless disregard of Jones' constitutional rights and innocence.  No reasonable detective or officer would have believed that this conduct was lawful.

231.    As a direct and proximate result of Defendants' evidence tampering, Jones was subjected to an unfair trial in violation of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law and his right to a fair trial.

232.    Due to Defendants' misconduct, Jones suffered 32 years of wrongful imprisonment; and endured all of the other physical, emotional and pecuniary damages set forth above.

### Count IV
### 42 U.S.C. §1983 Claim for Suppression of Exculpatory Evidence in Violation of the Fourteenth Amendment
### (Against Smith, LaGarde, and One or More John Doe Defendants)

233.    Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

234.    Upon information and belief, Defendants suppressed exculpatory evidence, including portion of the Starks Tape which they erased by performing a "crash edit."

235.    As alleged above, one or more Defendants performed the above-described acts under color of state law, deliberately, recklessly, and with deliberate indifference or reckless disregard of Jones' constitutional rights and innocence.  No reasonable officer would have believed that this conduct was lawful.

236.    As a direct and proximate result of Defendants' suppression of exculpatory evidence, Jones suffered an unfair trial in violation of his clearly established Fourteenth Amendment right to be free from deprivation of liberty without due process of law.

237.    Due to Defendant's misconduct, Jones suffered 32 years of wrongful imprisonment; and endured all of the other physical, emotional and pecuniary damages set forth above.

### Count V

## 42 U.S.C. §1983 Claim for Conspiracy to Violate Constitutional Rights
**(Against Gillis, Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, and One or More John Doe Defendants)**

238.     Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

239.     Defendants, acting within the scope of their employment and under color of state law, conspired, reached a mutual understanding, and acted in concert to deprive Jones of his Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to receive a fair trial.

240.     In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including without limitation, the following:

a.   Improperly influencing witnesses and inducing them to falsely identify Jones as the shooter in numerous photo-arrays;

b.   Conducting otherwise improper photographic arrays;

c.   Suppressing material exculpatory evidence to which Jones was lawfully entitled and which would have led to his timelier exoneration of the false murder charge, including, but not limited to, the erased portion of the Starks Videotape;

d.   Tampering with evidence to remove exculpatory material, including with respect to the Starks Videotape;

e.   Maliciously prosecuting Jones by inducing witnesses to provide false identifications of Jones during the investigation; and

f.   Providing false testimony themselves, including regarding alleged out-of-court identifications made by witnesses.

46

241.    The Defendants' conspiracy directly and proximately caused the constitutional deprivations suffered by Jones, including his false arrest, malicious prosecution, unfair trial, wrongful conviction, and unlawful confinement, and all other damages and injuries set forth above.

## Count VI
### 42 U.S.C. §1983 Claim for Failure to Intercede
### (Against Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, Gillis, and One or More John Doe Defendants)

242.    Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

243.    Defendants had a duty to prevent the depravation of Jones' constitutional rights.

244.    By their conduct and under color of state law, Defendants had opportunities to intercede on behalf of Jones to prevent the violation of Jones' right against the deprivation of liberty without due process and his malicious prosecution, but, due to their intentional conduct or reckless and deliberate indifference, declined and refused to do so.

245.    These Defendants' failures to intercede violated Jones' clearly established constitutional rights, including but not limited to his rights under the Fourth and Fourteenth Amendments.

246.    Defendants performed the above-described acts under the color of state law, deliberately, recklessly, and with deliberate indifference or reckless disregard for Jones' constitutional rights and innocence.

247.    As a direct and proximate result of Defendants malicious acts, Jones was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 32 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

**Count VII**
**42 U.S.C. §1983 Claim for Supervisory Liability**
**(Against Gillis and Sproules)**

248.     Jones hereby incorporates by reference all of the foregoing paragraphs and further

alleges as follows.

249.     The false arrest, malicious prosecution, unfair trial, wrongful conviction, and

prolonged confinement of Jones was caused by Defendants Gillis and Sproules, supervisors of

the Brockton Police Department, acting in their individual capacities, who, with deliberate

indifference to the rights of criminal suspects, failed to adequately train, supervise, or discipline

Defendants Smith and LaGarde in proper investigative techniques, identification procedures, and

the documentation and disclosure of evidence to prosecutors.

250.     In doing so, Defendants Gillis and Sproules tacitly acquiesced in, condoned, or

encouraged Defendants to engage in unconstitutional conduct, including, without limitation,

tampering with evidence, using unduly coercive and suggestive identification procedures, and

suppressing exculpatory evidence.

251.     Defendants Gillis and Sproules, by deliberately or recklessly failing to train,

supervise, or discipline their subordinate officers, caused their subordinates to deprive Jones of

his clearly established constitutional rights, including but not limited to his right to be free from

deprivation of liberty without due process of law, his right to a fair trial, and his right to be free

from unreasonable searches and seizures.

252.     Moreover, Defendants Gillis and Sproules allowed their subordinates to act with

impunity in an environment in which those subordinates were not supervised, disciplined, or

trained, and in which those subordinates knew that their violations of Jones' constitutional rights

would be facilitated, approved, or condoned by Defendants Gillis and Sproules.

48

253.     As a direct and proximate result of the actions of Defendants Gillis and Sproules, Jones was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 32 years of wrongful imprisonment, and endured all other physical, emotional, and pecuniary damages set forth above.

### Count VIII

### 42 U.S.C. §1983 Monell Claim

### Policy, Practice and Custom of Evidence Tampering in Criminal Investigations or Being Deliberately Indifferent to Such Practice as to Deprive Criminal Defendants of Exculpatory Evidence

254.     Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

255.     The City of Brockton, by and through final policymakers and their delegees, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, including Jones, maintained a policy and practice of evidence tampering in criminal investigations.

256.     Chief of Police Gillis and Chief Detective Sproules were on at least constructive notice of the policy and practice of evidence tampering prior to the investigation and arrest of Jones.  *Nicholas Celia, Jr., vs. City of Brockton, et al.*, 1990 U.S. Dist. LEXIS 2572 (D. Mass 1990).

257.     Defendants Gillis and Sproules assigned Detectives Smith and LaGarde to the investigation of the murder of Guillermo Rodrigues and were responsible for supervising them and other officers during this investigation, and in the subsequent prosecution of Jones.

258.     Under the direction and knowledge Gillis and Sproules, one or more officers at BPD tampered with the Starks Videotape by performing a "crash edit" and erased a portion of

the Terie Starks interview recording.  The purpose of this crash edit was to deprive Jones of exculpatory evidence.

259.    The tampered-with Starks Videotape was a pivotal piece of evidence at Jones' murder trial and in his appeals.  The Starks Videotape, in combination with Detective Smith's false testimony, were the primary factors in Jones' conviction and lost appeals.

260.    As a direct and proximate result of the Brockton Police Department's practice and policy of evidence tampering in criminal investigations, Jones was convicted of murder in 1986, lost his appeals and two motions for new trial, and spent over thirty years of his life wrongfully incarcerated in prison.

## Count IX

### 42 U.S.C. §1983 Monell Claim
### Failure to Supervise, Train, and Discipline Detectives and Officer in Proper Investigative Techniques

261.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

262.    The City of Brockton, by and through final policymakers and their delegees, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, including Jones, failed to supervise, train, and discipline Brockton Police detectives and officers in proper criminal investigative techniques.

263.    Defendants were not trained in proper investigative techniques.  Nor were they disciplined for utilizing improper techniques.

264.    The need to supervise, train, and discipline Brockton Police detectives and officers was apparent, as demonstrated by the botched investigation into Officer Nicholas Celia, as well as the general culture of corruption and recklessness amongst the Brockton Police detectives and officers.

265.     Gillis failed to supervise Detectives Smith and LaGarde, as well as other BPD officers involved in the investigation and arrest of Jones, and in the subsequent prosecution of Jones.

266.     Sproules was unable to supervise Detectives Smith and LaGarde due to his struggle with substance abuse.

267.     Detectives Smith and LaGarde utilized improper investigative techniques, including coercion of witnesses and destruction of exculpatory evidence, during the course of their investigation and after the arrest of Jones.

268.     These improper investigative techniques led directly to Jones' arrest and conviction.

269.     As a direct and proximate result of the City of Brockton's failure to supervise, train, or discipline Brockton Police detectives and officers, Jones' constitutional rights were violated and he was wrongfully prosecuted, convicted, and imprisoned for 32 years.

**State Law Claims**

**<u>Count X</u>**
**Malicious Prosecution**
**(Against Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, and One or More John Doe Defendants)**

270.     Jones hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

271.     Defendants caused Jones to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated Jones' favor in a manner indicative of innocence.

272.     Defendants accused Jones of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

273.     Defendants made statements regarding Jones' alleged culpability with knowledge that those statements were false and perjured, tampered with key evidence, and withheld exculpatory information.

274.     Proof of this malicious prosecution was confirmed years after Jones conviction when Judge McGuire found that one or more members of the Brockton Police Department performed a crash edit of the Starks Videotape and that Detective Smith testified falsely to conceal the officers' misconduct.

275.     These actions were undertaken with malice, willfulness, and reckless indifference to the rights of Jones.

276.     As a direct and proximate result of Defendants' malicious acts, Jones was falsely arrested in violation of his clearly established rights under the Fourth Amendment, suffered an unfair trial, a wrongful conviction, and 32 years of wrongful imprisonment, and endured all of the other physical, emotional and pecuniary damages set forth above.

## Count XI
### Civil Conspiracy
**(Against Gillis, Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, and One or More John Doe Defendants)**

277.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

278.     As described in the preceding paragraphs, Defendants, acting within the scope of their employment and under color of state law, conspired to deprive Jones of his constitutional rights.

279.    In furtherance of the conspiracy, these Defendants committed overt acts described above and were otherwise willful participants in joint activity.

280.    Proof of this misconduct was confirmed years after Jones conviction when Judge McGuire found that one or more members of the Brockton Police Department engaged in evidence tampering and that Detective Smith testified falsely to conceal the officers' misconduct.

281.    This misconduct was undertaken with malice, willfulness, and reckless indifference to the rights of others.

282.    As a direct and proximate result of Defendants' conspiracy, Jones suffered damages as is more fully alleged above.

### Count XII
### Intentional Infliction of Emotional Distress
**(Against Gillis, Smith, LaGarde, Colocousis, Shanks, Luciano, Spillane, Washek, Sproules, and One or More John Doe Defendants)**

283.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows.

284.    Defendants, in falsely arresting and initiating the prosecution of Jones without probable cause and with malice, engaged in a continuous pattern of extreme and outrageous conduct directed at Jones from the time of Jones' false arrest on November 17, 1985 until at least his acquittal after the Commonwealth retried him in June 2019.

285.    Defendants knew or should have known that their false arrest and initiation of prosecution of Jones, and the imprisonment of Jones which directly and proximately resulted from their actions, was likely to cause severe emotional distress.

286.    These acts and omissions did in fact cause Jones to suffer extreme emotional distress.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants:

1.      For compensatory damages in an amount to be determine at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For reasonable attorneys' fees, together with costs and disbursements, pursuant to

42 U.S.C. § 1988 and the inherent powers of this Court;

4.      For pre-judgment interest as allowed by law; and

5.      For such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.


DARRELL JONES,

By his attorneys,


/s/ K.Neil Austin
Anthony D. Mirenda (BBO # 550587)
amirenda@foleyhoag.com
K. Neil Austin (BBO# 657204)
naustin@foleyhoag.com
Caroline Donovan (BBO # 683274)
cdonovan@foleyhoag.com
Ned Melanson (BBO # 705653)
nmelanson@foleyhoag.com
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated:  December 15, 2020